UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

SECURITIES AND EXCHANGE COMMISSION, )
)
           Plaintiff, )
  v. )
)
SCOTT A. HAIRE and )
WOUND MANAGEMENT TECHNOLOGIES, INC., )
)
           Defendants. )
)

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

### I.  INTRODUCTION

1. From at least July through November 2009, Defendants Scott A. Haire and Wound Management Technologies, Inc. engaged in a fraudulent scheme and market manipulation involving Wound Management's stock.

2. In furtherance of the fraudulent stock scheme, the Defendants arranged for the payment of an illegal kickback to a purported trustee of a pension fund in connection with the purchase of restricted shares of Wound Management from a separate entity (the "Separate Entity").  A purported friend of the trustee acted as a middleman and helped arrange the restricted stock transaction.

3. The Defendants attempted to conceal the kickback by having the Separate Entity enter into a consulting agreement with a fake consulting company purportedly created to receive the kickback.

4. In addition to paying the bribe and kickback, Wound Management issued shares of stock to the middleman, as compensation for introducing Haire to the purported pension fund trustee.

5. As part of the market manipulation, the Defendants paid a bribe to a purportedly corrupt broker to induce him to purchase shares of Wound Management in the open market.

6. The Defendants engaged in this manipulation in an effort to falsely generate the appearance of market interest in Wound Management, induce public purchases of the stock, and artificially increase its trading volume and price.

7. Unbeknownst to the Defendants, the corrupt pension fund trustee and broker were fictional creations of the FBI. The purported friend of the pension fund trustee who helped arrange the deals was an undercover FBI agent, and the middleman was a witness cooperating with the FBI.

8. As a result of the conduct described in this Complaint, the Defendants violated Section 17(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(1); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); and Exchange Act Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c). Unless restrained and enjoined, they are reasonably likely to continue to violate the federal securities laws.

9. The Commission respectfully requests that the Court enter: (a) a permanent injunction restraining and enjoining the Defendants from violating the federal securities laws; (b) an order directing the Defendants to pay disgorgement with prejudgment interest; (c) an order directing the Defendants to pay civil money penalties;

(d) an order barring Haire from participating in any offering of a penny stock; and (e) an order barring Haire from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## II.  DEFENDANTS

10.    During the relevant time period, Haire was Wound Management's president and CEO, and he resided in Ft. Worth, Texas and Coral Springs, Florida.

11.    Also during the relevant time period, Wound Management held itself out as a Texas corporation with its principal place of business in Ft. Worth, Texas, and offices in Ft. Lauderdale, Florida.  The company purported to be an emerging commercial stage company that distributes wound care products.  Its common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and thereby became subject to Section 13(a) reporting obligations. During the relevant time period, the company's common stock was quoted on OTC Link operated by OTC Markets Group, Inc. under the symbol "WNDM."

12.    Wound Management's stock is a "penny stock" as defined by the Exchange Act.  At all times relevant to this Complaint, the stock's shares traded at a high of $3.25 per share and an average price of approximately $2.40 per share.  During the same time period, Wound Management's stock did not meet any of the exceptions to penny stock classification pursuant to Section 3(a)(51) and Rule 3a51-1 of the Exchange Act.

### III. JURISDICTION AND VENUE

13. The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a); and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

14. This Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because during the relevant period Haire had a residence and Wound Management had offices in the District. Also, many of the Defendants' acts and transactions constituting violations of the Exchange Act occurred in the District. For example, Haire, on behalf of Wound Management, met with the cooperating witness and the undercover FBI agent in Broward County to discuss the restricted transaction scheme. In addition, Haire met with the cooperating witness in Broward County to discuss the market transaction scheme.

15. The Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of a means or instrumentality of interstate commerce, or of the mails, in connection with the conduct alleged in this Complaint.

### IV. THE FRAUDULENT SCHEMES

16. In July 2009, Haire began discussing possible fraudulent transactions involving Wound Management with the cooperating witness.

#### A. The Restricted Stock Transaction and Kickback

17. On September 1, 2009, Haire met with the cooperating witness and the FBI agent in Broward County to discuss an illicit business arrangement involving Wound

Management restricted stock. The FBI agent posed as a contact for the corrupt, fictitious pension fund trustee.

18. During the meeting, the parties discussed a scheme whereby the pension fund would purchase Wound Management stock in exchange for a 30% kickback to the pension fund trustee. The kickback, which the Separate Entity would pay to a sham consulting company, would purportedly be disbursed amongst the pension fund trustee, the manager of the pension fund, and the FBI agent posing as the trustee's contact.

19. The undercover FBI agent also stressed to Haire that the pension fund trustee and manager were fiduciaries for a group of employees who depended upon them for their retirement, and thus they had fiduciary responsibilities to the pension fund and its investors.

20. The parties later agreed the pension fund would enter into a subscription agreement to purchase $50,000 of shares of restricted stock of Wound Management in exchange for a 30% kickback.

21. Subsequently, Haire sent the FBI agent an unsigned subscription agreement between the pension fund and the Separate Entity. The subscription agreement provided for the pension fund to purchase 21,276 shares of Wound Management restricted stock for $50,000.

22. To conceal the kickback, the Separate Entity entered into a consulting agreement with the sham consulting company.

23. Appended to the consulting agreement was a schedule providing for the payment of $15,000 – representing the 30% kickback – "[f]or the services to be rendered and performed" by the phony consulting company.

24.     The consulting agreement was used to provide an air of legitimacy to the fraud.  As the undercover FBI agent had explained to Haire, the consulting company would generate a sham invoice to avoid any appearance of impropriety.

25.     On September 29, the Separate Entity sent the signed subscription agreement to the FBI agent, who then wired $50,000 to the Separate Entity's bank account.

26.     That same day, an individual from Haire's office arranged for the delivery of the $15,000 kickback from the Separate Entity to the sham consulting company.

27.     Following a delay, the transfer agent issued a stock certificate for 21,739 shares of Wound Management's restricted stock to the pension fund.  Haire, as Wound Management's president, signed the stock certificate.

28.     In mid October, Haire contacted the undercover FBI agent about doing another restricted stock transaction with the pension fund.  Ultimately, however, there were no additional restricted stock transactions.

### B.  The Market Manipulation and Bribe

29.      In October 2009, Haire and the cooperating witness also discussed a market manipulation scheme involving Wound Management's common stock, in order to increase the trading volume and price, and create a false impression the stock was developing an active public market.

30.     According to the scheme, Haire would make payments to the cooperating witness's friend and business associate, a purportedly corrupt broker who, unbeknownst to Haire, was a fictitious person.  The corrupt broker in turn would buy shares of Wound Management stock in the open market.

31.     Haire believed the broker would use money held in his customers' discretionary accounts to buy between $200,000 and $250,000 worth of Wound Management stock.

32.     According to the scheme, the purchases, which would occur over the course of approximately a month, were intended to create the appearance of market interest in Wound Management, induce public purchases of the stock, raise the stock's price, and artificially increase its trading volume.

33.     In exchange for the fraudulent buying, Haire agreed to pay the corrupt broker a bribe, in the form of unrestricted Wound Management stock, of "one for four" or 25% of the total amount the broker purchased in the open market.

34.     Prior to beginning any trading, Haire was required to provide the broker with a deposit of 10,000 shares of unrestricted Wound Management stock. To conceal the deposit, the shares were to be issued to the broker's "dummy company."

35.     The parties agreed the corrupt broker would provide a reconciliation of the trading every week. Haire would then be expected to compensate the broker for that trading activity.

36.     To mask the fraudulent purchases, Haire and the cooperating witness agreed Haire would issue Wound Management press releases to be "coordinated" with the corrupt broker's buying. The cooperating witness told Haire the broker wanted to see the press releases before Wound Management issued them.

37.     Haire subsequently provided the cooperating witness with a schedule of press releases for Wound Management.

38. Three days later, Haire and the cooperating witness met in Broward County to finalize the scheme. After discussing the importance of coordinating the broker's buying with Wound Management "news," the cooperating witness said to Haire, "Are we manipulating the market? We're manipulating the market. Let's call a spade a spade." Haire did not voice any disagreement.

39. Shortly thereafter, Haire provided the cooperating witness with an advance copy of a Wound Management draft press release to forward to the corrupt broker.

40. That same day, Wound Management issued 10,000 shares of common stock to the corrupt broker's dummy company and 10,000 shares to the cooperating witness (as compensation for his introductions).

41. The next day, the cooperating witness e-mailed Haire that the broker could start buying 5,000 shares the next day to "prime the pump" and would be purchasing "a lot more on Monday once the press is out since he has the stock you sent."

42. The following morning, Haire provided the cooperating witness with an advance copy of another Wound Management draft press release to forward to the corrupt broker.

43. That same day, the FBI, to create the appearance of broker activity, purchased 5,000 shares of Wound Management stock in the open market for $10,000. Three days later, the FBI purchased an additional 3,000 shares of Wound Management stock in the open market for $5,975.

44. At the same time, Wound Management issued a press release almost identical to the one Haire had provided to the cooperating witness three days earlier. The

company issued this press release to create the false impression the broker's buying activity was spurred by positive news about Wound Management.

45. In the following months, Haire sought to engage in additional illicit deals with the cooperating witness involving another of his penny stock companies. However, no additional transactions occurred.

## COUNT I

### Fraud In Violation of Section 17(a)(1) of the Securities Act

46. The Commission realleges and incorporates paragraphs 1 through 45 of its Complaint. From at least July through November 2009, the Defendants directly and indirectly, by use of the means or instrumentality of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

47. By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(l) of the Securities Act, 15 U.S.C. §77q(a)(1).

## COUNT II

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act

48. The Commission realleges and incorporates paragraphs 1 through 45 of this Complaint.

49. From at least July through November 2009, the Defendants, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully or recklessly:

    (a) employed devices, schemes, or artifices to defraud; or

    (b) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

  50. By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule l0b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c).

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### **Declaratory Relief**

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged in this Complaint.

### II.

### **Permanent Injunctive Relief**

Issue a Permanent Injunction restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Sections 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act, as indicated above.

### III.

### Disgorgement

Issue an Order directing all Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### IV.

### Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d); and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

### V.

### Penny Stock Bar

Issue an Order barring Haire from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d) of the Exchange Act,15 U.S.C. § 78u(d), for the violations alleged in this Complaint.

### VI.

### Officer and Director Bar

Issue an Order pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2), barring Haire from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## VII.

### **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## VIII.

### **Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

June 4, 2012                    By:        s/C. Ian Anderson
                                           C. Ian Anderson
                                           Senior Trial Counsel
                                           Court No. A5501232
                                           Direct Dial: (305) 982-6317
                                           E-mail: andersonci@sec.gov
                                           *Lead Counsel*

                                           Trisha D. Sindler
                                           Senior Counsel
                                           Florida Bar # 0773492
                                           Telephone: (305) 982-6352
                                           E-mail : fuchst@sec.gov

                                           **ATTORNEYS FOR PLAINTIFF**
                                           **SECURITIES AND EXCHANGE COMMISSION**
                                           801 Brickell Avenue, Suite 1800
                                           Miami, Florida 33131
                                           Telephone: (305) 982-6300
                                           Facsimile: (305) 536-4154